Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/18/2022 09:06 AM CST

- 470 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

In re Interest of Madison T. et al.,
children under 18 years of age.
State of Nebraska, appellee, v.
Crystal L., appellant.

___ N.W.2d ___

Filed January 11, 2022.    Nos. A-21-102, A-21-120, A-21-121.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below.

2. **Juvenile Courts: Evidence: Appeal and Error.** When the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another.

3. **Parental Rights: Proof.** Neb. Rev. Stat. § 43-292 (Reissue 2016) contains 11 separate subsections, any one of which can serve as a basis for terminating parental rights when coupled with evidence that termination is in the best interests of the child.

4. ____: ____. To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in Neb. Rev. Stat. § 43-292 (Reissue 2016) exists and that termination is in the child's best interests.

5. ____: ____. Neb. Rev. Stat. § 43-292(7) (Reissue 2016) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent.

6. **Parental Rights: Juvenile Courts.** Reasonable efforts to reunify a family are required under the juvenile code only when termination is sought under Neb. Rev. Stat. § 43-292(6) (Reissue 2016).

7. **Parental Rights: Presumptions: Proof.** A child's best interests are presumed to be served by having a relationship with his or her parent. This presumption is overcome only when the State has proved that the parent is unfit.

- 471 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

8. **Parental Rights: Statutes: Words and Phrases.** Although the term "unfitness" is not expressly stated in Neb. Rev. Stat. § 43-292 (Reissue 2016), it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests.

9. **Parental Rights: Words and Phrases.** Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.

10. **Parental Rights.** The best interests analysis and the parental unfitness analysis, in the context of a termination of parental rights case, are separate inquiries, but each examines essentially the same underlying facts as the other.

11. **Parental Rights: Words and Phrases.** A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights; therefore, with such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort.

12. **Parental Rights: Guardians and Conservators: Proof.** A guardianship in some instances might be a reasonable alternative to termination of parental rights. But there is no burden on the State to prove that termination is the only alternative available.

13. **Parental Rights: Proof.** A bridge order might in some instances be a reasonable alternative to termination of parental rights, but there is no burden on the State to prove that termination is the only reasonable alternative available. The only burden on the State is to prove, by clear and convincing evidence, that termination of parental rights is in the best interests of the child and that one or more of the conditions set out in Neb. Rev. Stat. § 43-292 (Reissue 2016) exists.

14. **Juvenile Courts: Statutes: Legislature: Child Custody.** In enacting Neb. Rev. Stat. § 43-246.02 (Cum. Supp. 2018), authorizing bridge orders, the Legislature crafted a solution for temporary continuity when the child is no longer in need of the juvenile court's protection; the juvenile court has made, through a dispositional order, a custody determination in the child's best interests; and the juvenile court does not wish to enter a domestic relations custody decree under the power granted by Neb. Rev. Stat. § 25-2740(3) (Cum. Supp. 2020).

15. **Parental Rights.** Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity.

16. ____. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights.

- 472 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

Appeals from the County Court for Custer County: Kale B. Burdick, Judge. Affirmed.

Vikki S. Stamm, of Stamm Romero & Associates, P.C., L.L.O., and Marsha E. Fangmeyer for appellant.

Steven R. Bowers, Custer County Attorney, and Kayla C. Clark for appellee.

Julie K.W. Gawrych, of Wroblewski & Gawrych Law Office, L.L.C., guardian ad litem.

Moore, Bishop, and Arterburn, Judges.

Bishop, Judge.

## INTRODUCTION

Crystal L. appeals from the decision of the county court for Custer County, sitting as a juvenile court, terminating her parental rights to three of her children. We affirm.

## BACKGROUND

### Procedural Background

Crystal is the mother of Madison T., born in 2013; Conrad L., born in 2011; Hailey L., born in 2005; and Austin S., born in 2004. Austin is autistic and has "ODD" and "ADHD," as well as some other mental health issues.

Stephen T. is the father of Madison. Benjamin G. is the father of Conrad. The State made no allegations against Stephen or Benjamin in these current juvenile cases. Because Stephen and Benjamin are not part of this appeal, they will only be discussed as necessary. We note that Madison and Conrad now live with their respective fathers.

Daniel K. is the father of Hailey. Hailey lives with Daniel, and neither were part of the current juvenile cases. Because Hailey and Daniel are not part of this appeal, they will only be discussed as necessary.

Nicholas S. is the father of Austin. There is some indication in our record that the State sought to terminate Nicholas'

- 473 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

parental rights, but the current status of his parental rights is not clear from our record. Because Austin's father is not part of this appeal, he will only be discussed as necessary. We note that Austin currently lives with his maternal great aunt.

On December 31, 2018, Crystal went to a bar with a friend around 11 p.m. and left her children home alone. Austin, the oldest child, was 14 years old at the time; he is autistic and had been diagnosed with "ODD" and "ADHD." Hailey was 13 years old at the time, Conrad was 7, and Madison was 5. Crystal got "pretty intoxicated" at the bar. After leaving the bar after midnight on January 1, 2019, the friend, who had also been drinking, went to Crystal's home in Broken Bow, Nebraska, to watch the children while Crystal went to another town with a different friend; Crystal ended up using methamphetamine. Crystal returned home midmorning on January 1, and her friend was still watching the children, but the friend left when Crystal got home. (At the time, it was thought that all four children were left at home on New Year's Eve, but at the time of the termination hearing in November 2020, it was learned that Hailey was with her father on December 31, 2018; therefore, it was only Madison, Conrad, and Austin who were at Crystal's home that night.)

On January 3, 2019, a law enforcement officer conducted a welfare check on the children at Crystal's home. Crystal appeared to be under the influence that day. She admitted to relapsing on methamphetamine on New Year's Eve and informed the officer that she had plans to go to inpatient treatment in Arizona the next day. Law enforcement left after Crystal's grandfather arrived to take over care for the children. Crystal's mother then picked the children up from Crystal's grandfather and continued to care for them. A follow-up hair follicle test was performed on the children, and Madison's test was positive for "THC"; the other children's hair was not long enough to test.

Crystal left for treatment in Arizona on January 6, 2019, and on January 11, she signed a power of attorney for the children

- 474 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

to be with her mother. In order to accommodate the children's schooling, the maternal grandmother cared for the children at Crystal's home during the week and in her own home in Taylor, Nebraska, on the weekends. The heating unit in Crystal's home was "red-tagged" on January 10, and according to the grandmother, the landlord refused to repair or replace the unit until the rent was paid. As a result, the grandmother used space heaters to heat Crystal's home.

The State filed separately docketed petitions on February 8, 2019, alleging that Madison, Conrad, and Austin fell within Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because Crystal neglected or refused to provide proper or necessary subsistence, education, or other care necessary for their health, morals, or well-being; they lacked proper parental care by reason of the fault or habits of Crystal; or they were in a situation injurious to their health or morals.

At a hearing on February 26, 2019, the State made an oral motion for the care and custody of the children to be placed with Nebraska's Department of Health and Human Services (DHHS). In its journal entry and order filed that same day, the juvenile court sustained the State's motion. The juvenile court placed the children in the temporary care and custody of DHHS because Crystal was currently located at an out-of-state treatment facility and one of the children tested positive for exposure to controlled substances. Although Crystal signed a temporary delegation of parental powers on January 11 giving her mother her parental powers over the children for a period not to exceed 6 months, the court found that "[t]he delegation of parental powers does not appear to have been executed properly and [the] court questions its validity." The court ordered DHHS to determine if the children's current placement with their grandmother was appropriate and safe; if deemed unsafe or inappropriate, DHHS was to find an appropriate placement for the children. DHHS was also ordered to set up visits with the parents as deemed appropriate.

On March 17, 2019, all three children were moved from their foster home placement with their grandmother to a

- 475 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

different relative foster home placement with their great aunt, where Austin has remained. On May 15, Madison was placed with her father, where she has remained. On June 14, Conrad was placed with his father, where he has remained.

A contested adjudication hearing was held on August 8, 2019. Following the hearing, the juvenile court took the matter of adjudication under advisement, but ordered DHHS to "begin full panel drug testing" of Crystal, "forthwith." On August 15, the juvenile court "sustain[ed] the allegations" of the petitions and adjudicated Madison, Conrad, and Austin as being within the meaning of § 43-247(3)(a).

The disposition hearing was held on October 24, 2019. The juvenile court approved and adopted the DHHS case plan and court report dated October 11, 2019, as modified, and ordered the parties to comply with its terms. The only goal pertaining to Crystal in the case plan was for Crystal to keep her home free from drug use in order to safely parent her children and provide for their needs. Strategies for that goal were for Crystal to (1) attend individual therapy to assist her in her sober living and (2) follow all recommendations made to her by her inpatient provider. Services to be utilized were inpatient treatment, individual therapy, Alcoholics Anonymous (AA) and/or Narcotics Anonymous (NA), and case management.

On February 19, 2020, Crystal filed an objection to the DHHS case plan and court report dated January 23, 2020. The review hearing on March 19 was continued to June 5. At the hearing on June 5, Crystal withdrew her objection to the January case plan and court report; the juvenile court adopted that case plan and court report and ordered the parties to comply with its terms. That case plan contained the initial goal, strategies, and services pertaining to Crystal, but also added a second goal for Crystal to provide age and developmentally appropriate supervision for her children. The strategies for the new goal were for Crystal to (1) learn and demonstrate knowledge of child development, (2) learn and demonstrate knowledge of appropriate child expectations, (3) supervise her children

- 476 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

appropriately to their age and development, and (4) monitor all electronic usage and ensure it is appropriate. Services to be utilized regarding the new goal were case management, individual therapy, family therapy, and family support.

On August 26, 2020, Crystal filed a motion for bridge order in both Madison's case and Conrad's case. Crystal alleged that those two children had been placed with their respective fathers and that the juvenile court action may be safely closed once orders for custody, physical care, and visitation had been entered by the district court. She noted that filings had not yet been instituted in any district court. However, she requested that the juvenile court enter an order granting her and each child's respective father joint legal and physical custody of their child, subject to a parenting plan setting forth a schedule for the physical placement of the child and a holiday schedule.

A DHHS court report and case plan dated August 27, 2020, recommended that a bridge order be completed for Madison and for Conrad, stating that DHHS believed the plan was in the best interests of those children and would "provide permanency for them with their fathers." As for Austin, DHHS recommended that he remain placed with his great aunt as she "is able to provide the routine and structure in the best interest of Austin's needs." The report and case plan indicated that Austin's great aunt would provide permanency for him "if the case were to go to a guardianship," and the "primary permanency plan of Guardianship Relative is being achieved by 01-19-2021."

On September 1, 2020, Conrad's father filed objections to Crystal's motion for a bridge order and to the August 27 DHHS court report and case plan that recommended a bridge order be completed for Conrad. Also on September 1, the children's guardian ad litem (GAL) filed objections to Crystal's motion for a bridge order for Madison and for Conrad, and to the DHHS court report and case plan for all three children, because the GAL believed that it was in the children's best interests to

- 477 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

remain outside of Crystal's legal and physical care, custody, and control.

On September 1, 2020, the State and the children's GAL jointly filed motions to terminate Crystal's parental rights to Madison, Conrad, and Austin pursuant to Neb. Rev. Stat. § 43-292(2), (3), (4), (6), (7), and (9) (Reissue 2016). The motions alleged as follows: Crystal substantially and continuously or repeatedly neglected and refused to give the children or a sibling necessary parental care and protection. Crystal, being financially able, had willfully neglected to provide the children with the necessary subsistence, education, or other care necessary for their health, morals, or welfare or had neglected to pay for such subsistence, education, or other care when legal custody of the children was "lodged with other and such payment ordered by the court." Crystal was unfit by reason of habitual use of intoxicating liquor or narcotic drugs, or repeated lewd lascivious behavior, which conduct was seriously detrimental to the health, morals, or well-being of the children. Reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication of the children under § 43-247(3)(a). The children had been in an out-of-home placement for 15 or more of the most recent 22 months. Crystal subjected the children to aggravated circumstances, including, but not limited to, chronic abuse, abandonment, and sexual abuse.

## Termination Hearing

A consolidated permanency and review hearing, hearing on the objections to the case plan, hearing on the motion for bridge order, and hearing on the motion to terminate Crystal's parental rights was held over the course of 3 days in November 2020. Numerous witnesses testified and several exhibits were received into evidence. A summary of the relevant evidence follows.

Kiela Richards testified that she has been a child and family services specialist with DHHS since May 2019. This family's case was one of the first four cases on her caseload after

- 478 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

completing training, and it was transferred to her in September or October from another caseworker who was leaving. Richards reviewed the case file when she was assigned to the case.

Richards testified that "N-FOCUS" is DHHS' recordkeeping system; it includes, among other things, historical information of any DHHS contact or involvement with the family, children's medications, doctors' appointments, and ongoing things that the parents are doing. Richards' review of N-FOCUS showed Crystal's extensive history with DHHS. Richards' testimony, along with the DHHS court reports and case plans received into evidence, revealed that Crystal had 17 accepted intakes and a total of 10 ongoing cases with DHHS.

The intakes noted in the DHHS court reports revealed numerous "unfounded" incidents involving alleged physical abuse or physical or emotional neglect related to one or more of the children from January 2010 to May 2018. Since they were deemed "unfounded," we will not recount them here or consider them in our de novo review. Other intakes were as follows:

06-22-2010: . . . Court Substantiated, Physical Neglect[.] Caller reports that between 9:00 and 9:30 PM on 06-21-2010, 6 year old Austin . . . was found wandering around outside in his pajamas over 5 blocks from home. Crystal thought the grandmother was watching him and the grandmother thought that Crystal had taken him to McDonalds. Caller reports that Austin had been off of his [medications] for over a week. Crystal tested positive for both methamphetamine[] and marijuana.

. . . .

12-11-2011: . . . Agency Substantiated, Physical Neglect[.] Allegations of one of the children . . . not wearing weather appropriate clothing while playing outside and being left unsupervised.

. . . .

03-11-2012: . . . Court Substantiated, Physical Neglect[.] Allegations of Crystal being under the influence

- 479 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

of methamphetamine and making methamphetamine in the family home with the children present.

. . . .

05-8-2017: [Disposition unknown.] The allegations are that Crystal beat Austin with a belt on 5/7/2017 after Austin lit a paper on fire in the home. Austin was kept home from school on 5/8/2017 because of the marks from the beating.

Crystal's voluntary and court cases that were noted in the DHHS court reports were as follows:

Crystal had a court case from 3/2007 to 2/2009. During this time, the family completed Intensive Family Preservation, drug and alcohol services, individual therapy, and family support services. The family was successful and the case was closed in 2/2009.

Crystal had another court case from 11/2009 to 5/2010. During this time frame, the family completed IFP, individual therapy for Crystal and therapeutic visits as a family. This case was successful and was closed in 5/2010.

Crystal had a court case from 6/2010 to 6/2011. During this time, the family completed therapy, community intervention, drug and alcohol services and Families Care. This case had been dismissed due to Crystal putting in place therapy, ResCare, Families Care and had [two doctors] as supports.

Crystal had a voluntary case from 1/2012 to 3/2012 that turned into a court case from 3/2012 to 8/2013. During this time, the family had home support[] services, drug and alcohol services, family support, and parenting skills. This case was dismissed in 8/2013 due to 6 months of stability and consistency and was referred to Early Intervention Professional Partners Program through Region 3.

Crystal had a court case from 1/2015 to 4/2015. During this case, the family was involved with family support, therapy, and professional partners support services. This

- 480 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

case turned to a voluntary case from 4/2015 to 5/2015. The family was successful and the case was dismissed.

Crystal had a voluntary case from 10/2015 to 2/2016. During this time, the family completed family support. There was an incident involving domestic violence. The perpetrator, Stephen[,] was asked to leave the home so the children could remain safe with Crystal. A safety plan was put in place and the case was closed.

Crystal had a voluntary case from 6/2017 to 10/2017. The family completed family peer support and IFP. Crystal was able to be successful with family support and the children were safe in the home. The case was closed.

Richards testified that the current case was opened in 2019 because of drug use allegations, as well as Crystal's extensive history with DHHS. Testimony from various witnesses was given regarding the events of December 31, 2018, when Crystal left the children at home while she went to a bar and later used methamphetamine, through January 3, 2019, when law enforcement performed a welfare check on the children, who were eventually left in the care of their grandmother when Crystal went to treatment in Arizona. Richards testified that the children were removed while their grandmother was caring for them because the home was not clean and the utilities were not working.

Richards stated that Crystal had two goals, the first of which was to keep her home free from drug use in order to safely parent her children and provide for their needs. To help her accomplish this goal, Crystal was to attend individual therapy to assist in her sober living and follow all recommendations by her inpatient provider. The services available to her were inpatient treatment, individual therapy, AA and NA, and case management.

Richards stated that Crystal reported attending inpatient treatment at a facility in Arizona from January to April 2019. DHHS did not have any releases signed by Crystal allowing them to get her treatment records from Arizona; Richards did

- 481 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

not ask Crystal to sign any releases, but asked her personally to provide records. Richards asked Crystal to provide documentation, recommendations, and a discharge summary from the treatment facility, but Crystal did not do so. However, within the week prior to the termination hearing, Richards received an email from Crystal's attorney with documents from the treatment facility in Arizona. An email and some treatment excerpts were received into evidence. The exhibits showed that Crystal had been at a wellness and/or recovery facility in Arizona in January, that she tested positive for amphetamines and methamphetamine after her arrival, and that her tentative discharge date was April 24; there is nothing to show whether she successfully completed treatment and what the recommendations were at the time of discharge.

Richards stated that Crystal also reported seeing Terry Dunlop for individual therapy; Richards asked Dunlop for an update regarding Crystal, but Dunlop reported that he had never seen Crystal as an individual therapy client and that he was only doing family therapy with her and Austin. Richards also stated that Crystal reported attending AA and NA support groups and having a sponsor, but Richards was not provided any documentation verifying Crystal's attendance.

There was an incident in December 2019 when Austin showed pornography to Madison and Conrad during a visit with Crystal. Thereafter, Crystal was given a second goal, which was to provide age and developmentally appropriate supervision for her children. To help her accomplish this goal, Crystal was to learn and demonstrate knowledge of child development and appropriate child expectations, supervise her children appropriately to their age and development, and monitor all electronic usage and ensure it was appropriate. The services available to her were individual therapy, family therapy, family support, and case management. As stated previously, despite Crystal's report that she attended individual therapy with Dunlop, Dunlop denied seeing Crystal as an individual therapy client. However, Crystal did attend family therapy and

- 482 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

participated in family support and case management. Richards stated the pornography incident led to a forensic interview at the Family Advocacy Network (FAN). Crystal denied that Madison or Conrad told her about the pornography, and she claimed that she found out about it from Madison's father. Conrad also reported that he was on Crystal's phone without her monitoring his usage. The issue was discussed at a team meeting in December, and it was understood that there was not to be usage of electronics moving forward.

Richards testified that when the current juvenile case began in early 2019, Crystal had supervised visits with the children and at some point progressed to unsupervised visits. When Richards became involved with this case in September or October 2019, Crystal was having unsupervised visits with the children. Around the beginning of December, DHHS found out about the pornography incident, and because the children were scheduled for a forensic interview, visits were "paused" for a while, "maybe the month of December."

Sara Stauffer testified that she was a forensic interviewer at FAN in Kearney, Nebraska. In December 2019, Stauffer interviewed Madison and Conrad. Madison "disclosed that Austin watches inappropriate [sic] on a telephone," and "at that point had wiggled his private part at her"; but she never saw the private part. Madison stated that she told her mother and that her mother checked on Austin and got mad at him. Conrad also "disclosed that Austin's inappropriate" and will "show him private parts . . . while watching on YouTube." Crystal testified that Austin did not have her phone on the day of the incident and that the video was on the television, specifically YouTube. She subsequently "put passwords on the TVs and on the PlayStation," and it was discussed at team meetings that the children should not be on electronics during visits.

Richards testified that when Crystal's visits resumed in January 2020, they were supervised by the children's great aunt. Austin's visits have remained supervised since that time. However, for a short period of time, Madison's and Conrad's

- 483 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

visits went back to being unsupervised. But there were concerns about Crystal's truthfulness and the lack of information being provided about when and where she was taking the children on visits. For example, Crystal gave a plan of what she was going to do with the children for their visits, but she did not follow through with the plan, and it was later learned that they had done something else instead (e.g., she took Conrad to Madison's father's house instead of fishing). According to Richards, DHHS could not ensure the children's safety was being taken into consideration. As a result, Conrad's visits went back to being supervised; it is unclear if Madison's visits did. The children's great aunt supervised the sibling visits for a while, but then there were concerns about her supervising all of the children together. Independence Rising was then engaged to supervise some of the visits. Other than when Conrad was on the phone too much during one visit, Richards could not recall if there were any other concerns noted during visits.

An Independence Rising employee testified that from August 23 to November 15, 2020, she supervised two visits between Crystal and all three children and seven visits when it was just Crystal and Conrad. All visits occurred in Crystal's home and were 5 hours in length. During visits, the children appeared to be engaged with Crystal and did activities with her, and Crystal paid attention to them, redirected them when necessary, and prepared meals. The Independence Rising employee's visitation notes received into evidence do not disclose any safety concerns.

Richards testified that at the time of the termination hearing in November 2020, Crystal was having weekly supervised visits with Austin and Conrad. Crystal's visits with Madison had temporarily stopped; she was having unsupervised visits, but Madison's father raised concerns that Crystal was not taking Madison to appropriate locations and that Madison was possibly around marijuana. Richards also learned that Crystal had some unauthorized visits with Madison, including two overnight visits. Richards stated she had recently sent a referral to

- 484 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

Independence Rising for supervised visits with Madison. When asked if she believed it was in the children's best interests to return to the unsupervised care of their mother, Richards responded, "I do not."

Richards helped create exhibit 43, which included a table for each child showing the number of DHHS intakes throughout their lives, as well as the percentage of time they had been out of home, a DHHS ward, or involved in a voluntary case with DHHS. The exhibit contained additional intakes that were not included in the DHHS court reports and case plans quoted previously in this opinion. According to exhibit 43, Madison had a total of 21 intakes from 2013 to 2020. She had spent 25.78 percent of her life out of home, 33.53 percent of her life as a DHHS ward, and 6.46 percent of her life involved in a voluntary case with DHHS. Conrad had a total of 35 intakes from 2011 to 2020. He had spent 28.46 percent of his life out of home, 39.99 percent of his life as a DHHS ward, and 6.25 percent of his life involved in a voluntary case with DHHS. Austin had a total of 48 intakes from 2007 to 2020. He had spent 22.96 percent of his life out of home, 40.92 percent of his life as a DHHS ward, and 3.61 percent of his life involved in a voluntary case with DHHS.

Richards testified that Madison currently lived with her father and was "doing good" there. Conrad currently lived with his father and was doing "[v]ery, very well" there. Although the DHHS court report dated August 27, 2020, recommended that bridge orders be completed for Madison and Conrad, at the time of the termination hearing in November, Richards was not in support of a bridge order for Conrad because he was stable and where he needed to be to meet his safety, well-being, and permanency; if a bridge order was entered, DHHS would no longer be involved. Richards was not asked about her current thoughts on a bridge order for Madison.

Richards stated that Austin is autistic and had an increase of sexual behaviors, but he had not received the necessary services for those issues throughout his life; DHHS has "put

- 485 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

. . . a lot of services in place for Austin, and he is doing well." Austin currently lived with his great aunt, and he was doing "[v]ery, very well" there.

According to Richards, on August 8, 2019, there was a referral and court order for Crystal to do drug patch testing. The DHHS case plan and court report dated January 23, 2020, states that "DHHS has received all negative drug patch results throughout the life of this ongoing case." Richards stated there was a time when testing was not being conducted because of the COVID-19 pandemic. Crystal subsequently had drug patches that tested positive for THC.

A functional family facilitator with Independence Rising, an agency hired by DHHS, testified that she did drug testing for Crystal. Crystal does "Pharmchek sweat patches" for drug testing; "the "patch[es] can be worn on a shoulder blade, the arm, or the lower back" and are changed weekly. The patch tests for "a five-panel of drugs": cocaine, opioids, methamphetamine, THC, and "PCP." Crystal had weekly positive tests for THC on September 25 and October 2, 9, and 16, 2020; her patch from September 18 appeared to have been tampered with. Richards testified that Crystal's drug patches on October 23 and November 11 were also positive for THC; November 11 was the week before the termination hearing began.

Crystal testified that this was her "sixth or seventh" case with DHHS. She stated that in 2007, both Austin and Hailey were removed from the home for approximately 1 year. In 2009, Austin was removed from the home. In 2012, she used methamphetamine around the children, and as part of that court case, she completed treatment. (Stauffer testified that in 2012, Conrad tested "positive for ingestion and exposure to methamphetamine.") Crystal stated that another juvenile case was filed in 2015, but was ultimately dismissed.

As to the current case, Crystal recounted the events from New Year's Eve 2018 to her contact with law enforcement on January 3, 2019, as set forth previously. Crystal left for

- 486 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

treatment on January 5, while her mother stayed with the children. She was discharged on March 31 and returned to Nebraska. By that time, the children had been removed from her mother's care.

Crystal stated that upon returning home from treatment, she attended individual therapy on a weekly basis for 3 to 4 months with "Judy," and when Judy retired, Crystal switched to Dunlop, who was also seeing Austin; she stopped seeing Dunlop in December 2019 or January 2020. In addition to therapy, Crystal attended AA meetings two to three times each week.

Crystal testified that she had been doing drug patch testing for several months, since "the last court hearing." She acknowledged that some results were positive for THC in September and October 2020. When asked if she had "an explanation of why the THC came up," Crystal responded, "No." She further stated, "I have asked people that do the patch changes [and] [t]hey said it could be medications that I am taking or it could simply be that it's just not being put on right." Crystal stated that she had a hair follicle test done on June 12 and October 23, 2020, on her "own recognizance" to prove that she had been staying sober, and the hair follicle tests came back negative; she had "also taken a UA on [her] own recognizance, and it was negative for everything."

Richards testified that she was aware that Crystal got two hair follicle tests done on her own initiative (i.e., not requested by DHHS), which had negative results. Richards contacted FAN and learned that if hair is treated or dyed in any way, it could affect the hair follicle test results. Crystal testified that she bleaches her hair and gets "perms"; she said she informed the laboratory that performed the hair follicle tests that she had bleached her hair and "they said that would be okay." Stauffer, the forensic interviewer from FAN, testified that she does hair follicle tests at FAN and that FAN does not test hair which has been chemically dyed or treated because the results will come back as "inconclusive."

- 487 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

In her testimony, Crystal denied smoking marijuana in the last 2 years. She stated that she last used marijuana 17 years ago and that she last used methamphetamine on December 31, 2018, and January 1, 2019. And she stated that before her most recent relapse, she had not used methamphetamine since 2012; however, she was confronted with her reports from treatment wherein she said she had been using methamphetamine three to four times per month, and had been using it on and off since 2012.

Crystal believes it would be in Austin's best interests for his great aunt to have guardianship over him and for Crystal to continue to have contact with him. Austin's great aunt testified that Crystal is a good mother and that if Austin does not get to see her, "it will be bad." The great aunt stated that there were a couple of months when Austin did not have visits with Crystal and that he was "[r]eally aggressive, argumentative"; once visits resumed, he was "[p]retty good."

Crystal believes she has beneficial relationships with Madison and Conrad and would like to continue to have contact with them.

Crystal testified that she has lived in Mason City, Nebraska, since March 31, 2019, in a home owned by the children's great aunt; she does not pay rent. She enrolled in cosmetology school in June 2019, was a full-time student, and would graduate "[w]ithin the next couple of weeks." She had "two job offers" for after graduation and wanted to move to Broken Bow to "be closer to [her] children."

Daniel, Hailey's father, testified that he got custody of Hailey via a district court order on January 17, 2019. When Hailey lived with Crystal, Hailey was "a mother" to her younger brother and sister. Daniel said Hailey "got the kids ready for school in the morning, helped them get dressed, helped them with breakfast, helped them with homework after school, . . . cooked dinner for them several nights a week . . . ." And she told Daniel that "she was basically their guardian at night to kind of protect them from some of the things that

- 488 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

she was afraid of them seeing and hearing," e.g., Crystal's "[b]ringing different men over to the house, being inebriated and being around the kids late at night."

The children's great aunt testified that prior to this case beginning, she provided childcare for Austin on Monday, Tuesday, Wednesday, and Thursday nights because Crystal worked the night shift (7 p.m. to approximately 7 a.m.); she would also have either Madison or Conrad those nights, while Hailey cared for the other child at their home. Crystal testified that Hailey was 13 years old when she would watch Madison or Conrad overnight while Crystal worked.

Stephen, Madison's father, testified that Madison has been living in his home since June 2019. He confirmed that until recently, he and Crystal had gotten along very well, and he had even given her more visitation with Madison than he was supposed to. However, in the "past maybe month, month and a half" prior to the termination hearing, he began having safety concerns about where Crystal was taking Madison for visits. He said that Crystal's boyfriend had been living across the street from him for about 6 months and that Crystal was taking Madison there on visits. According to Stephen, Crystal stays at her boyfriend's house "half the time," and people there "[smoke] pot, party[], stuff like that." Stephen also stated that there was "[a] lot of fighting over there, [Crystal] and her boyfriend," and that her boyfriend smokes "pot" and "hangs out with . . . that crowd." Crystal has come to Stephen's house on two occasions after she got in a fight with her boyfriend; one of those times she was "pretty intoxicated." Stephen also found out that Crystal had been taking Madison, age 7, to AA meetings with her. Stephen stated that "after this last incident" when he confronted Crystal about taking Madison to AA meetings, Richards told him there would be no more weekly unsupervised visits. Stephen did not have an objection to a bridge order because "Maddie needs a mom," but stated that Crystal had some "priorities and stuff she needs to work out."

- 489 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

Benjamin, Conrad's father, testified that Conrad came to live with him in June 2019. Crystal's visits started off fully supervised, went to unsupervised for a while, and then back to being fully supervised. Benjamin does not agree with a bridge order.

Julie Forrester testified that she is a licensed mental health practitioner. She saw Madison nine times from January 28 through April 8, 2020. DHHS required Madison to attend therapy because it had been reported that she had been exposed to sexually explicit videos through her half brother during a visitation at Crystal's home. Madison also witnessed her half brother masturbating in front of her at Crystal's home. Forrester worked with Madison on personal safety skills. Forrester met with Conrad 20 times between October 23, 2019, and August 20, 2020. They worked on Conrad's anxiety. They also worked on personal safety skills because, like Madison, Conrad had been exposed to sexually explicit videos and masturbation by his half brother. Forrester said that in addition to the therapy sessions, she was "utterly shocked at what [she had] heard today" in court, and she "would recommend absolutely not" giving Crystal custody of Madison or Conrad.

## Juvenile Court's Decision

In its detailed and thorough order entered on January 8, 2021, the juvenile court recounted the evidence presented at trial, including Crystal's extensive history with DHHS. After summarizing the testimony and other evidence presented, the court made a specific finding that Crystal lacked credibility and that "little, if any, weight is given to Crystal's testimony."

The juvenile court considered each of the statutory grounds for termination alleged by the State and the GAL and found that statutory grounds for termination had not been proved pursuant to § 43-292(3) or (9). However, the court found by clear and convincing evidence that statutory grounds for termination existed pursuant to § 43-292(2), (4), (6), and (7). The court also found that Crystal was unfit, stating:

- 490 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

Crystal's neglect of her children is not limited to the circumstances that led to the adjudications in the above-captioned cases. The neglect began when Austin and Hailey were toddlers and has continued ever since. [DHHS] and the courts have intervened on several occasions, but Crystal has been unable to permanently correct [her] apparent deficiencies or incapacities. Crystal's history is indicative of what the future holds in store for her and her children.

Finally, the court found that termination of Crystal's parental rights was in the children's best interests, and it terminated her rights to Madison, Conrad, and Austin.

In finding that it was in the children's best interests to terminate Crystal's parental rights, the juvenile court also found that bridge orders were not in Madison's or Conrad's best interests. The court did not specifically address the request for a guardianship for Austin. Accordingly, the court sustained the objections to, and rejected, the DHHS case plan and court report dated August 27, 2020, and it denied the motions for bridge orders.

Crystal appeals.

## ASSIGNMENTS OF ERROR

Crystal assigns, summarized and restated, that the juvenile court erred (1) at the permanency hearing by not finding that a termination of parental rights motion was going to be filed and instead leaving the goal as family preservation/reunification, (2) in finding that statutory grounds existed to terminate her parental rights, and (3) in finding that she was unfit and that termination of her parental rights was in the children's best interests.

## STANDARD OF REVIEW

[1,2] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

- 491 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

[3,4] In Nebraska, the grounds for terminating parental rights are codified in § 43-292. That statute contains 11 separate subsections, any one of which can serve as a basis for termination when coupled with evidence that termination is in the best interests of the child. *In re Interest of Mateo L. et al., supra*. It is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L. et al., supra*.

### Notice of Termination

Crystal contends that she did not receive notice that a motion to terminate her parental rights was going to be filed prior to it actually being filed. She claims that there was not a timely permanency hearing and that there was no indication the matter was going to be referred for a termination. She notes that the DHHS case plans and court reports adopted by the court throughout the case indicated the goal was family preservation for Madison and Conrad; the goal for Austin was originally reunification but it was later changed to a relative guardianship. Richards explained at trial that the reason the goal for Madison and Conrad was family preservation was because they lived with their fathers and thus DHHS was preserving the children's relationship with their fathers.

Despite her claim to the contrary, Crystal was provided adequate notice of the termination of parental rights proceedings. Termination of parental rights may be filed in an original petition, a supplemental petition, or motion. See Neb. Rev. Stat. § 43-291 (Reissue 2016). Section 43-291 provides:

> After a petition, a supplemental petition, or motion has been filed, the court shall cause to be endorsed on the

- 492 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

summons and notice that the proceeding is one to termi-
nate parental rights, shall set the time and place for the
hearing, and shall cause summons and notice, with a copy
of the petition, supplemental petition, or motion attached,
to be given in the same manner as required in other cases
before the juvenile court.

Crystal does not contend that the procedure set forth in
§ 43-291 was not followed in this case. Accordingly, she was
given appropriate notice of the termination proceeding.

### Statutory Grounds for Termination

We turn to the statutory bases alleged here. In their joint
motions, the State and the children's GAL sought to terminate
Crystal's parental rights under § 43-292(2), (3), (4), (6), (7),
and (9). The juvenile court found § 43-292(2), (4), (6), and (7)
existed by clear and convincing evidence.

[5] Section 43-292(7) allows for termination when "[t]he
juvenile has been in an out-of-home placement for fifteen or
more months of the most recent twenty-two months." By the
plain and ordinary meaning of the language in § 43-292(7),
there are no exceptions to the condition of 15 out of 22
months' out-of-home placement. *In re Interest of Mateo L. et
al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Section 43-292(7)
operates mechanically and, unlike the other subsections of
the statute, does not require the State to adduce evidence of
any specific fault on the part of a parent. *In re Interest of
Mateo L. et al., supra*. In other words, if the 15-out-of-22
formula is met, § 43-292(7) is met. *In re Interest of Mateo L.
et al., supra*.

In this case, the juvenile court ordered the children placed
in the care and custody of DHHS on February 26, 2019, and
DHHS was to determine a safe and appropriate placement for
them. Although the children had already been living with their
grandmother because Crystal was in an out-of-state treatment
facility, we will treat February 26, 2019, as the start date of
the out-of-home placement for purposes of our § 43-292(7)
calculation. The children remained out of Crystal's home

- 493 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

through at least November 20, 2020, when the termination hearing ended. That period easily satisfies the 15-out-of-22 formula.

[6] The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for termination in this case. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning the other statutory bases for termination. *In re Interest of Mateo L. et al., supra*. Furthermore, we note that because we do not consider whether termination of Crystal's parental rights was proper pursuant to § 43-292(6), Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2020), which requires reasonable efforts to reunify families, is not applicable to the instant case. Section 43-283.01 is only incorporated into § 43-292(6), not into the remaining subsections of § 43-292. See *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). See, also, *In re Interest of Mateo L. et al., supra* (reasonable efforts to reunify family required under juvenile code only when termination is sought under § 43-292(6)).

We next consider whether termination is in the children's best interests.

## Best Interests and Unfitness

[7-10] Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al.*, 309

- 494 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

Neb. 565, 961 N.W.2d 516 (2021). In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.*

We have previously recounted the evidence presented at the termination hearing, and we will not recount it again here. Notably, Crystal's history with DHHS goes back to 2007. Since that time, there have been numerous intakes for the children and several voluntary or juvenile court cases. In the past, Crystal would successfully resolve a voluntary or court case only to have another one filed shortly thereafter, sometimes within a matter of months. And "'one's history as a parent speaks to one's future as a parent.'" *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 909, 782 N.W.2d 320, 328 (2010).

In the current juvenile cases, Crystal left her 14-year-old autistic child home alone with her 7-year-old child and her 5-year-old child late at night while she got intoxicated at a bar. Crystal then went out of town and relapsed on methamphetamine while a friend, who had also been drinking, spent the night with her children. While we commend Crystal's efforts to get herself into treatment within the next few days, the record is not clear whether she successfully completed that inpatient treatment, and it appears her sobriety did not last. She tested positive for THC beginning in September 2020, and she was still testing positive for THC the week before the termination hearing began in November. Crystal's drug use is very concerning as Conrad tested positive for methamphetamine in 2012, Madison tested positive for THC in 2019, and drug use was one of the reasons the children were removed from Crystal's care in the current case.

- 495 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

In addition to her positive drug tests, Crystal was not truthful with DHHS on a number of occasions. She reported going to individual therapy when she did not, she had unauthorized visits with her children, and she did not keep DHHS informed of changes in her visitation plans on occasion. As a result, Crystal's visits had to be supervised to ensure the children's safety. At the time of the termination hearing in November 2020, Crystal was having only weekly supervised visits with Austin and Conrad. And her visits with Madison were temporarily stopped while DHHS sent a referral to a visitation provider. We acknowledge it appears that, other than the pornography incident in December 2019, there were no safety concerns with Crystal's visits, with the exception of recent events when Crystal took Madison to her boyfriend's house where Madison's father testified that people there "[smoke] pot" and "party[],", and also indicated that Crystal was taking Madison to AA meetings.

Forrester did not believe that Crystal should have custody of the children, and Richards did not believe that Crystal should have unsupervised contact with the children.

[11] A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights; therefore, with such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort. *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016).

[12] Crystal believed that a guardianship, rather than a termination of her parental rights, was in Austin's best interests. We acknowledge that a guardianship in some instances might be a reasonable alternative to termination of parental rights. But there is no burden on the State to prove that termination is the only alternative available. *In re Interest of Q.R. and D.R.*, 231 Neb. 791, 438 N.W.2d 146 (1989). Also, the Nebraska Supreme Court has noted that a guardianship does not achieve the degree of permanency equivalent to parenthood

- 496 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

or adoption. See *In re Interest of Antonio S. & Priscilla S.*, 270 Neb. 792, 708 N.W.2d 614 (2005). A guardianship under the Nebraska Juvenile Code is subject to the continuing jurisdiction of the juvenile court, which retains the power to terminate the guardianship. *Id*. See, also, *In re Interest of Amber G. et al.*, 250 Neb. 973, 554 N.W.2d 142 (1996), *disapproved on other grounds, In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 903 N.W.2d 651 (2017) (when guardianship is established, parent retains right to petition court for restoration of custody and full parental rights). Based on our de novo review, we conclude that a guardianship would not provide the permanency needed for Austin, as it would leave open Crystal's right to petition the court for restoration of custody. Accordingly, a guardianship was not in Austin's best interests.

[13] Crystal also believed that a bridge order, rather than a termination of her parental rights, was in Madison's and Conrad's best interests. Again, we acknowledge that a bridge order might in some instances be a reasonable alternative to termination of parental rights, but as also noted above, there is no burden on the State to prove that termination is the only reasonable alternative available. See *In re Interest of Q.R. and D.R., supra*. The only burden on the State is to prove, by clear and convincing evidence, that termination of parental rights is in the best interests of the child and that one or more of the conditions set out in § 43-292 exists. See *In re Interest of Q.R. and D.R., supra*. The juvenile court concluded a bridge order would not be in the best interests of Madison and Conrad, and we agree.

A bridge order is an order transferring jurisdiction over the child from the juvenile court to the district court. *In re Interest of Kamille C. & Kamiya C.*, 302 Neb. 226, 922 N.W.2d 739 (2019). See, also, Neb. Rev. Stat. § 43-246.02 (Cum. Supp. 2020). Section 43-246.02 provides in part:

(1) A juvenile court may terminate its jurisdiction under subdivision (3)(a) of section 43-247 by transferring jurisdiction over the juvenile's custody, physical care, and

- 497 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

visitation to the district court through a bridge order, if all of the following criteria are met:

(a) The juvenile has been adjudicated under subdivision (3)(a) of section 43-247 in an active juvenile court case and a dispositional order in that case is in place;

(b) Paternity of the juvenile has been legally established . . . ;

(c) The juvenile has been safely placed by the juvenile court with a legal parent; and

(d) The juvenile court has determined that its jurisdiction under subdivision (3)(a) of section 43-247 should properly end once orders for custody, physical care, and visitation are entered by the district court.

[14] The Nebraska Supreme Court addressed § 43-246.02 for the first time in *In re Interest of Kamille C. & Kamiya C., supra*, wherein it noted that § 43-246.02(1)(d) indicates that a bridge order is appropriate only when the juvenile case can safely be closed. The legislative intent "was to authorize the creation of '"Bridge Orders" to transfer a case from juvenile court to district court when a noncustodial parent has been deemed fit to safely care for a child, and close the unnecessary juvenile case.'" *In re Interest of Kamille C. & Kamiya C.*, 302 Neb. at 236, 922 N.W.2d at 748. The court stated:

In enacting § 43-246.02, authorizing bridge orders, the Legislature crafted a solution for temporary continuity *when the child is no longer in need of the juvenile court's protection*; the juvenile court has made, through a dispositional order, a custody determination in the child's best interests; and the juvenile court does not wish to enter a domestic relations custody decree under the power granted by § 25-2740(3). Such custody decree is instead entered by the district court after the transfer of jurisdiction over the child from juvenile court to district court, which transfer is inherent to the bridge order. . . .

Upon transfer, the district court shall "give full force and effect to the juvenile court bridge order as to custody

- 498 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

and parenting time." However, either party may "file a petition in district court for modification of the bridge order" and, if filed within 1 year after the filing date of the bridge order, "the party requesting modification shall not be required to demonstrate a substantial change of circumstance but instead shall demonstrate that such modification is in the best interests of the child." In such modification proceedings, the statutory scheme requires no deference to the juvenile court's judgment of the child's best interests. . . . In other words, the custody determination made by the juvenile court has no legally preclusive effect and will be made anew by the district court if either parent is discontent with the custody arrangement originally set forth by the bridge order.

*In re Interest of Kamille C. & Kamiya C.*, 302 Neb. at 237-38, 922 N.W.2d at 748-49 (emphasis supplied).

The juvenile court in the current cases found that subsections (1)(a), (1)(b), and (1)(c) of § 43-246.02 had been met, but that subsection (1)(d) had not. Based upon that finding, the juvenile court clearly was unable to conclude that its jurisdiction over Madison and Conrad should end. Nor was it ready, at least at that time, to award custody to their fathers by deeming them fit to safely care for them and thereby close the juvenile cases. We agree that while placement of Madison and Conrad with their respective fathers may have been the best alternative while these cases have been pending, the record is not sufficient to conclude that the children's fathers should be awarded permanent custody, at least at this time.

For example, there was evidence that Conrad and his father did not know each other prior to the placement of Conrad with him in this case. Conrad's father testified to his own challenges, noting that he had been "through treatment a couple of times" and did not quit "using" after that. He also indicated that in 2018, he "kind of hit [his] rock bottom" and "lost everything[,] [l]ost [his] kids[,] [and] wasn't able to be with [his] wife." While noting he had not "used in two years," he also said "it

- 499 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

doesn't mean that I don't have other problems in my life" and he was attending a program to address relationship and anger issues and "all kinds of stuff that are . . . habits, hangups, all that stuff." Conrad's father also discussed his concerns that a bridge order would ultimately allow Crystal to get Conrad back because he would not be able to financially afford to "fight her" in district court.

As for Madison's father, he testified that prior to the placement of Madison with him, he had visits with Madison every other weekend. He acknowledged he had used "meth" before and knows the symptoms. He also admitted that he allowed Crystal to keep Madison overnight on a couple occasions in February 2020 and over Halloween weekend that year despite knowing Crystal was not permitted to have overnight visitation. Madison's father testified that he did not have a driver's license "[b]ecause of [his] DUIs . . . [f]our" of them. He explained that this was why he, Crystal, and Madison traveled to Kearney together before school started to shop for clothes. He did not talk to the caseworker, Richards, in advance, but was seen by Richards while shopping. Madison's father also acknowledged that besides his "DUIs," he had been in trouble with the law for misdemeanors, "[b]attery, [and] a couple possessions of marijuana." But he claimed to have no convictions involving methamphetamine. Madison's father indicated that he was still on probation. While he did not object to a bridge order, he did not agree to a "50/50 bridge order."

In our de novo review of the record, we agree with the juvenile court that it would not be in Madison's and Conrad's best interests to terminate the court's jurisdiction over them by entering bridge orders granting their custody to their respective fathers. Doing so would remove the children from the juvenile court's jurisdiction where it was in a better position to determine what next steps were necessary to advance the best interests of these children. Given the record before us, it is understandable why the juvenile court determined that these juvenile cases could not safely be closed. Accordingly, we agree with

- 500 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF MADISON T. ET AL.
Cite as 30 Neb. App. 470

the juvenile court's determination that § 43-246.02(1)(d) had not been met and that bridge orders were not in the children's best interests.

[15,16] The juvenile court found that it was in the best interests of Madison, Conrad, and Austin that Crystal's parental rights be terminated. We agree. Crystal's involvement with DHHS and the juvenile court date back to 2007, and the current juvenile court cases were filed in January 2019. In these current court cases alone, the children had been out of Crystal's home for approximately 21 months at the time of the termination hearing. At the time of the termination hearing, Crystal was back to supervised visits and had recently been testing positive for drugs. These children deserve permanency. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). We find that the State has rebutted the presumption of parental fitness as to Crystal. We further find that there is clear and convincing evidence that it is in the children's best interests to terminate Crystal's parental rights.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Crystal's parental rights to Madison, Conrad, and Austin.

Affirmed.