IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF JADIS R.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF JADIS R., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JONATHAN L., APPELLANT.

Filed March 22, 2022.    No. A-21-654.

Appeal from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Audrey M. Long, of A. Elliott Law, P.C., L.L.O., for appellant.

Paul W. Snyder, Deputy Scotts Bluff County Attorney, for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

### INTRODUCTION

Jonathan L. appeals from the order of the Scotts Bluff County Court, sitting in its capacity as a juvenile court, terminating his parental rights. Jonathan asserts that the evidence was insufficient to support termination of his parental rights and that termination was not in the minor child's best interests. Katrina R. seeks affirmative relief in an Appellee brief improperly designated for that purpose. For the reasons stated herein, we affirm.

### STATEMENT OF FACTS

Jonathan and Katrina are the parents of Jadis R., who was born in August 2010. On January 28, 2021, Scotts Bluff Police Investigator Andrew Soucie responded to a child abuse intake regarding Jadis. The intake reflected that Jadis was residing in a motel room with his paternal

- 1 -

grandmother, Sheryl Beecher; that there were "a lot of people" staying in that motel room; that Jadis was not being taken care of properly; and that there was narcotic use occurring in the motel room which placed Jadis in danger. Upon arriving at the motel room, Beecher consented to Soucie entering the motel room to talk about Jadis. Upon entry into the motel room, Soucie observed narcotic paraphernalia on a table in plain view. After obtaining a warrant, Soucie searched the motel room locating multiple items of drug paraphernalia associated with both marijuana and methamphetamine use, 15 uncapped and used syringes and needles scattered throughout the room including on Jadis' clothing, and baggies with residue. These items were easily accessible to Jadis. Soucie obtained a second search warrant after motel staff located items inside a backpack while cleaning out the room. A search of the backpack uncovered 2.7 grams of methamphetamine, additional needles and syringes, and other items including suspected illegal substances and other drug paraphernalia. The adults living in the motel room were arrested for child abuse and possession of controlled substances. At that time, Jadis was placed on a 48-hour hold.

On January 29, 2021, the State filed a petition, as amended, alleging that Jadis came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Specifically, the State alleged that Jadis' parents "neglected or refused to provide special care made necessary by the mental condition of [Jadis]," that Jadis had "exhibited excessive absenteeism in that he was absent all or a portion of more than 10 days during the 2020-2021 school year," and that Jadis "was in a situation dangerous to life or limb or injurious to his health or morals" because he "lacks safe and stable housing" and his "parents neglect or refuse to provide [Jadis] with necessary parental care or protection." That same day, Jadis was placed in the custody of the State of Nebraska Department of Health and Human Services (DHHS). Jadis has remained in out-of-home placement during the pendency of this case.

In February 2021, prior to an adjudication hearing, the State filed motions to terminate Jonathan's and Katrina's parental rights pursuant to Neb. Rev. Stat. § 43-292(1), (2) and (4) (Reissue 2016). The termination hearing was held in June 2021. The court received into evidence several exhibits, including Jonathan's prior convictions for possession of marijuana, misdemeanor assault, attempted felon in possession of a firearm, and possession of methamphetamine; certified copies of the 2011 and 2014 juvenile cases involving Jadis; deposition testimony of two witnesses; and the court's March 9, 2021, journal entry and order.

During the termination hearing, Soucie testified to the events as previously set forth. The State adduced additional testimony from, inter alia, Lauren Trenkle, a DHHS child and family service specialist, whose deposition testimony was received into evidence; Breanna Bird, a DHHS child and family support worker who took over the case from Trenkle; Karen Norton, a family support worker; Michael Macias, Jadis' school counselor; and Stephanie Skinner, Jonathan's probation officer. Additionally, both Jonathan and Katrina testified in their own behalf.

Trenkle's deposition testimony provided that, after receiving a child abuse intake regarding Jadis, she conducted the initial assessment in which she interviewed Jadis and observed Jadis' January 2021 forensic interview. Trenkle stated that the intake documented concerns including Jadis' school absences, his living situation, and possible drug use by his caretaker. During her assessment, Trenkle unsuccessfully attempted to reach Jonathan by phone, then reached out to Beecher who stated that she had not seen Jonathan for a while and did not know how to reach him. Trenkle also spoke with Jonathan's ex-girlfriend who stated that she had not seen him in months.

Trenkle also learned from law enforcement that, although Jonathan had an active warrant, efforts to locate him had been unsuccessful. Trenkle stated that from the time she received the intake in January until the time she transferred the case to Breanna Bird for ongoing case management in March, Trenkle had only been able to reach Jonathan once and he had reported that he was living with Beecher at the motel. Jonathan requested visitation and indicated to Trenkle that probation was attempting to find him treatment for substance abuse.

In March 2021, Bird took over case management of this case from Trenkle. According to Bird, she had also worked with Jonathan and Jadis in a previous case from October 2014. As a caseworker, she reviewed prior cases which disclosed that Jadis had previously been removed on four occasions due to substance abuse by Jadis' caregivers. Bird stated that the last time that Jadis had been in Katrina's care was in the summer of 2019 and, at that time, Katrina contacted Beecher for assistance in caring for Jadis since Jonathan was incarcerated at that time. Jadis had remained in Beecher's care since the summer of 2019.

Bird testified that, during past cases, Jonathan had been actively using methamphetamine and had been incarcerated. Additionally, during the present juvenile case, Jonathan had been incarcerated in February, April, and May 2021. Bird testified that, despite her attempts at communication, she had minimal contact with Jonathan during this case with the most success occurring immediately after Jonathan's release from jail in February. During that contact, Jonathan reported to Bird that Jadis had been with Jonathan for about 2 weeks in January 2021, but because he was homeless, he requested that Beecher care for Jadis. Jonathan also admitted his struggles with drug use stating that he had progressed from using marijuana to using methamphetamine and heroin. Jonathan's third arrest in May 2021 resulted in his imprisonment which continued at the time of the termination hearing.

During this case, although Bird completed referrals to facilitate visitation between Jonathan and Jadis, visits could not initially be scheduled because the servicer's attempts to contact Jonathan failed. Bird testified that she called Jonathan to schedule visits but he stated that he was in Colorado for a funeral and would contact her to schedule visitation upon his return; however, Jonathan did not initially contact Bird when he returned from Colorado, rather he contacted her only after he was arrested. After Jonathan contacted Bird, visitation services were successfully scheduled, but Jonathan only attended 57 percent of those visits and Jonathan fell asleep during two of the visits that he did attend. Karen Norton supervised two of Jonathan's visits with Jadis. According to Norton, the visits generally went well and Jonathan provided snacks for Jadis. However, during the first visit, Jonathan became frustrated because the visit had to take place at the visitation center and Jonathan fell asleep "a couple of times" during visits.

Bird stated that Jonathan completed an evaluation with a counselor, but he was still actively using substances, was currently incarcerated, and had been homeless just prior to his arrest. Bird testified that, in her opinion, it was in Jadis' best interests for Jonathan's parental rights to be terminated due to the four prior removals, Jonathan's current and prior incarcerations and pattern of drug abuse, and the fact that Jadis had been in out-of-home placement for about one-third of Jadis' life. According to Bird, since the start of the present case, Jonathan had not paid child support for Jadis and had not provided the foster parents with clothing, money, food, or anything else for Jadis' support.

Stephanie Skinner, Jonathan's high-risk offender probation officer, testified that she was assigned to Jonathan's case in December 2019. According to Skinner, although Jonathan initially did well on probation, he stopped complying with the terms of his probation and stopped attending his individual counseling sessions until April 2021 when revocation and incarceration were on the table. Skinner stated that, due to Jonathan's mental health concerns as a result of unresolved childhood trauma, she secured treatment at dual-diagnosis facilities in order for Jonathan to address both his substance abuse and mental health concerns. Skinner testified that, despite being accepted into residential treatment on seven different occasions, Jonathan failed to report each time. Skinner also testified that Jonathan failed to comply with probation requirements that he report his location and maintain employment. She indicated that Jonathan previously resided with his girlfriend, but 3 weeks prior to being incarcerated, Jonathan reported that he was homeless. Skinner further indicated that Jonathan had not been employed since February 2020. Skinner testified that at the time of the termination hearing, Jonathan was still actively using substances including marijuana, methamphetamine, and fentanyl.

Michael Macias, Jadis' school counselor, testified that he was familiar with Jadis due to Jadis' attendance issues and conversations he had with Jadis. Macias testified that Jadis had missed more than 20 days of school and that, once that occurs, school policy is to contact the child's parents or guardians to work on an attendance plan. The school also sends out letters after children miss 5, 10, 15, and 20 days of school. Macias stated that, despite his attempts to contact Jonathan, he had only talked to him one or two times. Macias noted that he had more success in reaching Beecher, but Beecher generally could not provide a reason for Jadis' school absences and she declined offers to assist with getting Jadis to school. Macias testified that on a few occasions Jadis would come to his office to talk when Jadis was upset, tired, or hungry. After Jadis indicated that he did not have enough food at home, Macias was able to get Jadis on the pup pack program at school which supplies food to children.

According to Jonathan, Katrina was primarily responsible for Jadis' removal in previous cases, Jadis was not placed with him, and he was incarcerated during one of the cases. Jonathan stated that he did not believe that he had any rights to Jadis after the prior case had closed. Jonathan stated that Beecher, Jadis, and Jadis' brother came from Colorado and stayed with him in his rental home after Beecher was asked to vacate her residence. At that time, Jonathan stated that he still believed he did not have rights to Jadis since Beecher was receiving food stamps, ADC benefits, and appeared as if she had guardianship of Jadis. A month after Beecher and Jadis moved in with Jonathan, Jonathan moved in with his girlfriend, but continued to pay rent on his rental house where Jadis and Beecher continued to reside. Jonathan stated that after about 6 months he was laid off from his job and could no longer pay rent. Jadis moved in with Jonathan and his girlfriend for 6 to 8 months after which Jadis was returned to Beecher's care, ostensibly so Jonathan could go to treatment. Jonathan acknowledged, however, that he did not go into treatment after Jadis returned to Beecher's care. Jonathan stated that he was unaware that Beecher used illegal substances, but knew she had prescription pain medication. He stated that he and his mother never really had a great relationship, that she had never wanted him around when he was using, and that he had never known her to use drugs. Jonathan indicated that he became aware that Jadis had been tardy or absent from school but cited the guardianship as the reason for not intervening. Further, Jonathan acknowledged that his brother, who was residing in the motel with Beecher and Jadis at times, also

abused substances. He stated that he learned that Beecher was allowing his brother to visit and that he voiced his concerns about that to Beecher, but otherwise did not remove Jadis from Beecher's motel room. Jonathan stated that he did not remove Jadis from the situation with Beecher because he believed that there was nothing he could do based upon his belief that Beecher had guardianship over Jadis. Jonathan stated that he never sought out any documentation or verification of Beecher's guardianship status over Jadis.

Jonathan acknowledged that he had missed some of his visitations with Jadis because he decided it was best not to attend since he was actively using drugs. Jonathan stated that he had also recently been unable to speak with Jadis because the foster parent was unwilling to facilitate phone calls. Jonathan admitted that he had used substances including methamphetamine, marijuana, heroin, and fentanyl. Although Jonathan testified that he had stopped using heroin and fentanyl due to the juvenile case, he admitted that he was still actively using marijuana and methamphetamine. Jonathan stated that he did not want to go to treatment but that he is in a situation where he will lose his freedom if he does not. He said he felt that he does not have a safe place for Jadis while he attends treatment. Jonathan acknowledged that he needs to go to treatment in order to be in a position to care for Jadis, but stated he thinks a 30- to 90-day program is sufficient as opposed to probation's recommendation of a yearlong program. When asked how long Jadis needed to wait after being in out-of-home care for a third of his life, Jonathan stated that Jadis did not need to wait any longer.

In its order terminating Jonathan and Katrina's parental rights, the court noted that, although terminations pursuant to § 43-292(1) through (5) did not require a prior adjudication, the court found by a preponderance of the evidence that Jadis was a child as described in § 43-247(3)(a) due to truancy. The court further found that there were substantial concerns due to Jonathan's prior court involvement including his criminal history and the prior removals and DHHS cases, Jadis' status as a ward of the state for approximately 28 percent of his life, additional placements outside of the parental home due to his parents' incarcerations, and the four prior removals from the care of his parents. In its order the court stated:

[T]he court finds by clear and convincing evidence, that the State has established 43-292(2) and (4). This child has been in and out of foster homes, the homes of family members, and the homes of his parents without any consistency or stability. That is not in his best interest. The instability has been caused by his mother and father's continual drug use and drug lifestyle choices. They have not improved for years and years. There is no indication that real change will ever occur. The historic and current drug use is seriously detrimental to the health, morals, and well-being of [Jadis]. This court's best measure of future behavior is past behavior, and in the case at hand, the court has a long history of drug abuse, incarceration, neglect, instability, and mental health. [Jonathan] appears to be headed to prison or a long-term residential treatment facility; either way, he cannot take care of Jadis. [Katrina] continues to struggle with mental health and substances. She is currently on probation and her incarceration for a DUI is what put [Jadis] in a drug-infested motel room to begin with. It was a probation order that allegedly kept her from looking for Jadis in Nebraska.

Termination of parental cases alleged under § 43-292(2) or (4) are usually accompanied by expert testimony detailing the likelihood of a parent's recovery or

improvement. This case does not have such evidence. What this court does have are two parents, [Jonathan] and [Katrina], who have been the beneficiaries of a plethora of services from [DHHS], probation, and parole and they continue to fail; fail to improve their personal lives and fail to provide a safe, stable, drug free home. There is no reason this court should believe any new or different services will turn the tide. This little boy cannot continue to live such a dangerous and unpredictable life. He deserves stability.

The court then continued to find that termination was in Jadis' best interests, stating:

In the present case, [Jonathan] and [Katrina] are unfit and cannot perform reasonable parental obligations. There is little evidence regarding the actual relationships between Jadis and [Katrina] and [Jonathan]. He refused to leave his grandmother in Walmart; the evidence is clear and undeniable regarding the horrid living conditions Jadis was living in with his grandmother. Yet, he chose that over his mother. The court cannot find any beneficial relationship between [Jonathan] and Jadis. [Jonathan], by his own admission, is a drug addict who refuses to get treatment. He has been in and out of jail for drugs and assaultive behavior. Therefore, any possible sentimental connection between the two is far outweighed by the factors set forth above. Thus, the evidence is clear and convincing that it is in the juvenile's best interests that the parental rights of [Jonathan] and [Katrina] are terminated.

ASSIGNMENTS OF ERROR

Jonathan assigns as error that the court erred in finding that (1) the State met the statutory grounds to terminate his parental rights and (2) termination of his parental rights was in Jadis' best interests.

We note that Katrina also attempted to appeal but she failed to comply with the rules regarding cross-appeals. Jonathan was the first party to file a notice of appeal and, therefore, he was the appellant. However, pursuant to Neb. Ct. R. App. P. § 2-109(D)(4), once a notice of appeal is filed all other parties become appellees and can file a cross-appeal. A cross-appellant is required to comply with the rules on cross-appeals, including the requirement that he or she designate on the cover of his or her brief that it is a cross-appeal, and set forth his or her cross-appeal in a separate division of the brief entitled "Brief on Cross-Appeal." *In re Interest of Steven S. et al.*, 27 Neb. App. 831, 936 N.W.2d 762 (2019). Here, Katrina did not designate on the cover of her brief that she was cross-appealing; her brief is labelled as "Brief of Appellee." In *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 146-47, 602 N.W.2d 439, 451 (1999), the Nebraska Supreme Court noted that Nebraska appellate courts

have always refused to consider a prayer for affirmative relief where such a claim is raised in a brief designated as that of an appellee. . . .

Parties wishing to secure appellate review of their claims for relief must be aware of, and abide by, the rules of [the Nebraska Supreme Court] and the Court of Appeals in presenting such claims. Any party who fails to properly identify and present its claim does so at its peril.

- 6 -

Accord *In re interest of Steven S.et al., supra.*

Katrina's brief is identified as "Brief of Appellee." Because Katrina failed to properly identify that she was cross-appealing the termination of her parental rights, and she listed herself as an appellee while seeking affirmative relief, we do not consider her request for affirmative relief separately and granted the State's separately filed motion requesting that we not consider Katrina's brief for the reasons set out above.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *Id.*

## ANALYSIS

On appeal, Jonathan contends that the evidence was insufficient to support termination of his parental rights under § 43-292(2) and (4) and that termination was not in Jadis' best interests. In Nebraska, the grounds for terminating parental rights are codified in § 43-292 which contains 11 separate subsections, any one of which can serve as a basis for termination when coupled with evidence that termination is in the best interests of the child. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). It is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L. et al., supra.*

### STATUTORY BASIS

We first address Jonathan's claim that the court erred in terminating his parental rights because the evidence was insufficient to support the statutory bases for termination. In connection with that claim, he contends there was insufficient evidence to support termination under § 43-292(2) or (4), and contends that the court improperly based its decision on the prior juvenile cases and failed to require the State to provide reasonable efforts to prevent the removal and placement in temporary custody.

Here, Jonathan's parental rights were terminated under § 43-292(2) and (4). Section 43-292(2) requires proof that "[t]he parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection."

The questions of what constitutes neglect and necessary parental care and protection are generally determined on a case-by-case basis, but common factual patterns include parental incarceration, adjudication, involuntary termination, or relinquishment of previous children, unsanitary house and unkempt children, or addiction to drugs or alcohol. See *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017). Parents may as surely neglect a child of whom they do not have possession by failing to put themselves in a position to acquire possession as by not properly caring for a child of whom they do have possession. *In re Interest of Louis S. et al.*, 17 Neb. App. 867, 774 N.W.2d 416 (2009), *abrogated on other grounds, In re Interest of Zylena*

*R. & Adrionna R.*, 284 Neb. 834, 825 N.W.2d 173 (2012). A parent's failure to provide an environment to which his or her children can return can establish substantial, continual, and repeated neglect. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in a parental rights termination case under § 43-292(2). *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

The evidence presented at trial established that Jonathan had previously been offered services in which he refused to engage, that he failed to enter mental health and substance abuse treatment, and that he engaged only minimally in visitation with Jadis. Jadis had been placed in out-of-home placement on four prior occasions due to drug use by his caregivers. Although Jonathan argues that the court improperly considered his prior involvement with DHHS, the court is permitted to consider prior cases when deciding a motion to terminate parental rights. One's history as a parent speaks to one's future as a parent and past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in parental rights termination case under § 43-292(2). See *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). Further, the most recent removal showed that prior DHHS efforts to remove safety threats had been unsuccessful as was evidenced by the methamphetamine and drug paraphernalia found in the motel room occupied by Beecher and Jadis with those items located within Jadis' reach.

The record shows that Jonathan has continuously engaged in criminal behavior; has continuously failed to provide a safe and stable home for Jadis; has continued to use heroin, fentanyl, marijuana, and methamphetamine; and has refused to enter treatment despite having seven opportunities to do so. At the time of termination hearing, Johnathan was incarcerated for the third time in 4 months and he failed to actively participate in the services he has been offered. Jonathan has maintained only minimal contact with the caseworker, his probation officer, or Jadis' guidance counselor, despite their efforts to contact him. Further, Jonathan's contact with Jadis has been inconsistent both prior to and during the pendency of this case, he attended only 57 percent of the visits he was offered, and he fell asleep during two of those visits.

Despite being aware that Jadis had been truant from school and that Beecher allowed Jadis to be present around illegal substances, Jonathan felt it was not his responsibility to remove Jadis from the situation based upon his belief that his parental rights had already been terminated or that a guardianship prevented him from interfering. Even while Jadis was in Jonathan's care, in order to facilitate Jonathan's drug use, Jonathan frequently left Jadis in the care of others, including a girlfriend who had DHHS involvement relating to her own children. Additionally, although Jonathan resided in the home with Jadis, Jonathan later moved out to live with his girlfriend, leaving Jadis behind in Beecher's care. Upon our de novo review, we agree with the county court that the State presented clear and convincing evidence that Jonathan had substantially and continuously or repeatedly neglected and refused to give Jadis proper parental care and protection and that termination of Jonathan's parental right was supported under § 43-292(2).

Jonathan argues that the court failed to find that the State made reasonable efforts to prevent Jadis' removal and "[t]here was absolutely no showing by the State that they complied with Neb. Rev. Stat. [§] 43-283.01 for providing any reasonable efforts to avoid removal." Brief for appellant at 21. However, the State is not required to prove reasonable efforts unless the State is terminating

pursuant to § 43-292(6). *In re Interest of Madison T. et al.*, 30 Neb. App. 470, 970 N.W.2d 122 (2022). See, *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002) (§ 43-283.01 is only incorporated into § 43-292(6), not into remaining subsections of § 43-292); *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021) (reasonable efforts to reunify family required under juvenile code only when termination is sought under § 43-292(6)).

Having determined that termination of Jonathan's parental rights was proper pursuant to § 43-292(2), we need not address whether termination was also proper under § 43-292(4). If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

BEST INTERESTS

Jonathan next contends that the court erred in determining that termination of his parental rights was in Jadis' best interests. Jonathan argues that the State did not show unfitness or deficiency that prevented performance of his ability to parent.

In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Becka P. et al., supra*. See *In re Interest of Jahon S.,* 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

Jonathan generally argues that the evidence was insufficient as he continued to pay his child support obligation while Jadis was living in Colorado, that he was unaware that he had rights to Jadis, that the prior removals occurred while Jadis was in the care of Katrina, that he was providing food and clothing, and that he did what he could do with his limited role. Jonathan stated that the court ignored those facts, as well as the fact that he and Jadis have a strong bond and he was not given an opportunity to prove his ability to parent since the State failed to provide reasonable efforts. We disagree.

Jonathan was aware that Jadis was truant from school and that he was residing with individuals known to use illegal substances. Jadis was residing with Jonathan's mother for a period of time in a motel room which was ultimately found to contain methamphetamine, drug

paraphernalia, and uncapped needles scattered throughout the room, all of which were accessible to Jadis. By his own admission, Jonathan resided in that same motel room for some length of time, yet he did not take steps to ensure Jadis' safety, seemingly being more dedicated to pursuing his own drug addiction. Jonathan's argument that he did what he could in his limited role with Jadis is not persuasive. The Nebraska Supreme Court has stated that both parents are obligated to perform the parental duties and the father cannot delegate those duties to the mother of the child and expect to be held harmless if she neglects the child. *In re Interest of Reed*, 212 Neb. 208, 322 N.W.2d 411 (1982).

Additionally, Jadis' best interests and Jonathan's fitness to parent Jadis were affected by Jonathan's long history of drug abuse with methamphetamine, heroin, marijuana and fentanyl. Jonathan had been using for a long period of time and was still actively using up to the time of the termination. Although Jonathan had the ability to enter into a substance use program, he missed his check-in on seven different occasions indicating Jonathan's unwillingness to rehabilitate himself. The fact that he now states that he wants to enter treatment is of little relevance in light of the significant amount of time Jadis has spent out of the parental home due to the four prior removals. Last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

This substance use had resulted in Jadis spending 28 percent of his life in out-of-home care as arranged by DHHS. When not involved in arranged care, Jadis was cared for primarily by Beecher since 2019. That involved Jadis first moving to Colorado with Beecher until she was asked to vacate her home. Beecher and Jadis then moved in with Jonathan in his rental home which Jonathan later vacated since he could no longer afford to pay for it. Jonathan then moved in with a girlfriend and Jadis came to live with him for a short period of time. During this time, Jonathan left Jadis in the care of his girlfriend while he left to use substances. Thereafter, Jonathan indicated he was going into treatment and sent Jadis back with Beecher who had acquired a motel room, but Jonathan did not seek treatment. Thereafter, Jonathan sporadically visited and stayed at the motel room which was later found to contain illegal drugs. In short, Jadis has experienced a protracted history of unsafe and unstable housing, and lack of parental care and protection.

In addition to Jonathan failing to provide stability, he also only minimally engaged with the services offered in order for Jadis to return to his care. Jonathan asserts that he did not have enough time to show that he could parent. We disagree. Jadis was removed in January 2021 and the termination hearing was held in June. During that time, Jonathan was arrested three times. In between his incarcerations, he could not be reached by the caseworkers or the visitation worker. Despite indicating he would get in contact to schedule a time for visitation with Jadis, he did not do so. It was not until he was incarcerated again that he requested visitation. And although visitation was arranged, his attendance was minimal and he fell asleep during two of the visits that he actually attended. This was not the first time Jonathan demonstrated a lack of attention to Jadis. Jadis reported not having seen Jonathan for a protracted period of time prior to his removal and Jonathan testified that he had not spoken to Jadis for 3 weeks prior to the termination hearing. In addition to visitation, Jonathan was referred for family support services. Jonathan's participation in the case was minimal, and he was not actively engaged in probation services including drug

treatment and testing, mental health counseling, and substance abuse counseling, in order to alleviate the need for out-of-home placement.

Jonathan has not ensured that Jadis' educational or physical needs were met as shown by Jadis' school attendance and the school having to place Jadis on the pup pack program receiving double the amount of food because he did not have enough to eat. Further, when the school counselor attempted to contact Jonathan regarding Jadis' truancy, Jonathan's phone was usually disconnected, and he had only been able to reach him once or twice. Further, Jonathan has continued to engage in criminal behavior which led to his incarceration on multiple occasions throughout Jadis' life. Jonathan had been incarcerated three times in the 4 months immediately preceding the termination. Additionally, his probation officer generally indicated that he had made little progress during the time he was cooperating with probation apart from when he was attempting to avoid probation revocation.

Under our de novo review, we find that Jadis should not have to sit idly by waiting for Jonathan to place himself in a position to provide for Jadis' needs. Children should not be suspended in foster care awaiting uncertain parental maturity, and we find that this is not a case where Jadis should be forced to forgo permanency and linger in foster care. See *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Jadis deserves a safe, stable and permanent home. There is nothing in this record to support a reasonable conclusion that this court would expect to see a beneficial change in the circumstances for Jadis. We therefore find that the court did not err when it found that the best interests required termination of Jonathan's parental rights.

CONCLUSION

For the above stated reasons, we affirm the court's order terminating the parental rights of Jonathan. Likewise, because we must disregard Katrina's improperly filed brief, we affirm the court's order terminating Katrina's parental rights.

AFFIRMED.