IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF SOPHIA J. & SELENE J.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF SOPHIA J. & SELENE J., CHILDREN UNDER THE AGE OF 18.

STATE OF NEBRASKA, APPELLEE,

V.

JESUS J., APPELLANT.

Filed June 4, 2024.    Nos. A-23-924, A-23-925.

Appeals from the County Court for Cheyenne County: RANDIN R. ROLAND, Judge. Affirmed.

Robert S. Harvoy, for appellant.

Amber Horn, Chief Deputy Cheyenne County Attorney, for appellee.

Audrey M. Long, guardian ad litem.

MOORE, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Jesus J. appeals from the order of the Cheyenne County Court, sitting in its capacity as juvenile court, terminating his parental rights. Jesus argues that the court erred in finding that it was in the minor children's best interests to terminate his parental rights and in finding that termination was the last resort available. For the reasons stated herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Jesus and Anne J. are the biological parents of Sophia J., born in 2014, and Selene J., born in 2016. Anne did not appeal the termination of her parental rights and therefore will only be mentioned as necessary to provide context to issues related to Jesus' appeal.

On November 8, 2021, the children were placed in a 48-hour law enforcement hold after their parents were arrested following a physical altercation. During the children's 48-hour law enforcement hold, a Department of Health and Human Services (DHHS) caseworker completed a safety assessment which determined that the children were unsafe in their parents' care as a result of domestic violence, drug and alcohol abuse, and a history of prior neglect issues and criminal charges. As a result of the safety assessment findings, the State filed a motion for temporary custody of the children. The minor children were then placed in the care and custody of DHHS and have not been returned to the parental home during the pendency of this case. At the time of their removal, Sophia was 7 years old and Selene was 5 years old.

Following Sophia and Selene's removal from the parental home, they participated in forensic interviews. During those interviews, both Sophia and Selene disclosed that they had witnessed multiple incidents of domestic violence between their parents. Sophia described witnessing her parents fighting, yelling, screaming, punching, and throwing things at each other, as well as a specific incident in which she recalled that both of her parents were bleeding.

On November 12, 2021, the State filed a petition, which was later amended to a no-fault petition, alleging that Sophia and Selene came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because they lacked proper parental care due to an extensive history of the children being exposed to domestic violence by the parents.

In February 2022, the minor children were adjudicated based on Jesus and Anne's no contest admissions to the allegations contained in the operative adjudication petition. The court continued out-of-home placement of the children subject to Jesus' supervised visitation. The court further ordered Jesus to complete a substance abuse evaluation and to participate in random drug and alcohol testing.

During a March 2022 disposition hearing, the court accepted DHHS' case plan, received Jesus' substance use evaluation, and continued placement of the children outside the parental home. The court ordered Jesus to participate in supervised visitation, to complete a mental health evaluation and follow all the recommendations, and to remain on the drug testing patch. Throughout the pendency of the case, the court also ordered Jesus to, inter alia, complete a psychological/psychiatric evaluation and attend individual therapy sessions with the children's therapist as a first step to determine if Child-Parent Psychotherapy (CPP) would be appropriate and to follow the therapist's recommendations. The court order provided that supervised visitation could be increased at the team's discretion after Jesus had 2 weeks of negative drug tests. The court also ordered that the case be referred for a child welfare conference at the mediation center and for a report regarding case progression, services, goal of reunification, and the likelihood of achieving reunification by the target date to be transmitted to the court.

Following a motion by Jesus to obtain placement of his children, the court denied his request, noting that Jesus' visits had only increased from 10 hours per week to 15 hours per week and had remained fully supervised; all of Jesus' sweat patches had tested positive for methamphetamine; and the children's therapist stated that placement with Jesus at that time would be emotionally damaging for the children.

## 2. MOTION TO TERMINATE PARENTAL RIGHTS

In March 2023, the children's guardian ad litem and the State filed a motion to terminate Jesus' parental rights pursuant to Neb. Rev. Stat. § 43-292(2) (Reissue 2016) (substantial and continuous or repeated neglect and refusal to give necessary parental care and protection); § 43-292(3) (willful neglect to provide subsistence, education, or care); § 43-292(4) (unfitness by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which is seriously detrimental to health, morals, or well-being of juveniles); § 43-292(6) (reasonable efforts failed to correct conditions leading to adjudication); and (7) (out-of-home placement for 15 or more months of the most recent 22 months) (Reissue 2016); and alleged that termination was in the minor children's best interests.

## 3. TERMINATION HEARING

The termination hearing was held over 3 days in August and October 2023. Testimony was adduced from witnesses including Jennifer Burgess, a DHHS caseworker; Sheila Howard, the children's therapist; and Jesus.

During the pendency of the case, DHHS provided services including safety assessments, risk assessments, family strength and needs assessments, individual therapy for the children, and family support. Jesus' family support goals included working on healthy coping mechanisms, healthy relationships, fighting fair, and his sobriety.

During the pendency of the case, Jesus complied with court orders to: complete an individual diagnostic interview (IDI); complete a batterer's intervention program; complete a parenting evaluation; complete a parenting class; participate in family support services; maintain appropriate housing; engage in family therapy sessions; and attend supervised visitation. Additionally, Jesus had not been involved in an incident of domestic violence since November 2021, and he sporadically participated in narcotics anonymous/alcoholics anonymous.

Despite Jesus' participation in services, Burgess testified that Jesus did not complete enough of his goals to reunify with his children. According to Burgess, Jesus participated in drug testing, but even after receiving treatment, Jesus continued to test positive for methamphetamine and amphetamine during the pendency of the case and, even after positive test results, he denied using drugs and made excuses as to why the results were showing positive. One of the drug testing workers testified that some of Jesus' excuses for positive drug tests were due to his apartment and, after he moved, he blamed his positive tests on being exposed to items that had not been washed since leaving the apartment.

Burgess further testified that although Jesus acknowledged that his children were living in an environment that exposed them to violence, Jesus blamed the children's mother, minimized his role, and he continued to maintain a relationship with the minor children's mother. Jesus was

unable to move beyond supervised visitation, and although Jesus was previously employed, he was fired for theft which also resulted in criminal charges.

(a) Therapist's Testimony

Howard testified that she began individual therapy with Sophia and Selene following their removal. Howard testified that therapeutic goals for Sophia included developing self-awareness, communicating her feelings, managing her anger, establishing boundaries, and learning to cope, and that Selene's goals were similar, except the objectives were pursued differently due to her age. According to Howard, since beginning therapy, Sophia has made improvements toward her goals.

Howard stated that she eventually added some family goals because the plan was to start adding Jesus into the therapy sessions for CPP. However, there were some barriers to starting family sessions, such as the children not being ready for it. Howard testified that eventually she was able to complete a handful of sessions, but she suspended those sessions for a few reasons:

> The first was because I started to be more concerned about the safety of their mental health and how it would affect our counseling. Sophia had had a couple of sessions with [Jesus] . . . one where she disassociated and one where . . . she kind of just detached. And after the first detachment . . . during a play therapy session, [Jesus] was given instructions of what to do during the sessions, or the activities to do, and then watched from a video.
>
> Um, and [Jesus] gave just even a mild criticism of her. And right away, you could see her affect change and she detached from wanting to support him and wanting to help him to just a flat affect. She was no longer responsive to him. And he didn't seem to be aware of it.
>
> And then the following meeting that she had with him was a bonding exercise to see where attachment is at. And during this exercise, Sophia detached and went into a dysregulated state . . . like a trauma response . . . [Jesus] put lotion on . . . her hands and her arms. And the whole time, she could not make eye contact with him. And she would stare at my crayon box. Just stared out there with a flat affect. And then she was supposed to put lotion on him and it . . . stopped.

Howard testified that after observing Sophia pull her hands back after Jesus touched her, Jesus noticed "[b]ut instead of trying to figure out what was wrong with her, [he] monitored my reaction to it. And then at this point after the attachment, I . . . didn't want to push the family sessions anymore." Howard testified that although the children eventually agreed to participate in the sessions, the children never reached a point where they were comfortable talking to Jesus about their trauma. She further stated that Jesus did not acknowledge that he was responsible for causing trauma to the children and he either downplayed or minimized it during the individual session she had with him.

Howard described Jesus' attachment to Selene and Sophia as unhealthy. Howard testified that if Jesus was to reunite with the minor children, she was concerned that he would continue to use drugs and that the children "would end up in the same situation," being removed and "having to go through that again." She explained that the children's "attachment is affected every time that they don't have a permanent home where they're not taken out of and that's safe for them."

### (b) Foster Parent Testimony

Sophia and Selene's foster father, Jakeb M., testified that Sophia was very smart, was doing well in school, and has AD/HD and allergies but was otherwise healthy. According to Jakeb, Selene was also doing well academically and did not have any physical health concerns except for allergies.

According to Jakeb, when the children were first placed in his home, they had behavioral issues such as lying and being mean to each other and that after a "tough" first 4 months, he and his wife began seeing progress in managing the children's behavioral issues.

Jakeb stated that the children refused to go to visits with Jesus between 6 and 12 times, but they had not refused visits in the 6 months preceding the trial. According to Jakeb, the children occasionally regressed due to Jesus having inappropriate conversations with them about the timeline for the children to be able to come home; untruthful statements about the foster parents; or comments about how Jesus had been beaten up until he was bloody.

### (c) Jesus' Testimony

Jesus testified that he complied with the case plan goals and court orders in the case including participating in supervised visitation; completing substance use and mental health evaluations, individual therapy, and AA/NA; developing a safety network; completing a parenting class; and not using illegal substances. Jesus asserted that despite his positive drug patch tests, he was not using drugs. He testified that he individually purchased and passed 83 urinalysis tests and a single hair follicle test to prove it. Jesus stated that the negative results of his August 2023 hair follicle test went back 90 days which would include June and July, contradicting his four positive drug patch tests during that time period. We note that there are no such urinalysis tests in our record.

Jesus testified that he has a positive and beneficial relationship with both Sophia and Selene and that termination of his parental rights was not in the minor children's best interests.

### 4. COURT ORDER

Following the termination hearing, the court terminated Jesus' parental rights pursuant to § 43-292(2), (4), (6), and (7). The court found that there was clear and convincing evidence that termination of Jesus' parental rights was in the minor children's best interests, that the children need permanency, and that Jesus was not able to provide that for them. Specifically, the court noted that even though the case was opened in mid-November 2021, Jesus had not progressed beyond supervised visitations. The court further noted that Jesus "was unable to provide negative drug patches for a prolonged period of time throughout the case" and that he had exposed the children to "domestic violence, arguing, fighting, and drug use [which] prevented reunification, let alone unsupervised visits."

Jesus now appeals from the court's order terminating his parental rights.

## III. ASSIGNMENTS OF ERROR

Jesus assigns that the court erred in (1) finding that the evidence was sufficient to support a finding that termination was in the children's best interests and (2) finding that termination was the last resort with no other reasonable alternative including guardianship.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

### 1. TERMINATION OF PARENTAL RIGHTS

Jesus argues that the court erred in finding that it was in the children's best interests to terminate his parental rights.

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). The State must prove these facts by clear and convincing evidence. *Id*.

#### (a) Statutory Basis for Termination

Although Jesus does not separately assign error to the court's findings that one or more of the statutory grounds existed under § 43-292, because our review is de novo, we address this requirement before considering Jesus' specific assignments of error.

The grounds for terminating parental rights are codified in § 43-292. Any of the 11 separate subsections of § 43-292 can serve as a basis for termination when coupled with evidence that termination is in the best interests of the child. *In re Interest of Denzel D., supra*. The State has the burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Denzel D., supra*.

As relevant to this appeal, § 43-292(7) allows for termination when "the juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The look-back period to determine the existence of the statutory basis under § 43-292(7) of 15 of more months of the most recent 22 months is to be determined as of the date the petition or motion for termination of parental rights is filed and any change in placement after the filing of the petition or motion is to be considered as part of the analysis of parental fitness and the best interests of the child. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7),

the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Kenna S., supra.*

Here, based on our de novo review of the record, the children were removed from the parental home on November 12, 2021. The motion to terminate Jesus' parental rights was filed on March 22, 2023. At the time of the motion to terminate, the children had remained in out-of-home placement for approximately 17 months. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. See *In re Interest of Kenna S., supra.*

In sum, because both of the minor children have been in out-of-home placement for 15 or more months of the most recent 22 months, we find that the court did not err in finding that statutory grounds existed for termination of Jesus' parental rights under § 43-292(7). Having made this determination, we need not further address the sufficiency of the evidence to support termination under any other statutory ground. See *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019) (if appellate court determines that lower court correctly found that termination of parental rights is appropriate under one of statutory grounds set forth in § 43-292, appellate court need not further address sufficiency of evidence to support termination under any other statutory ground).

### (b) Best Interests

Jesus assigns that the court erred in finding that it was in the children's best interests to terminate his parental rights. More specifically, Jesus argues that the evidence showed that he made significant progress on his case plan and that he should be afforded more time to rehabilitate and reunite with his children.

In addition to proving at least one statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.*

The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

Termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. *In re Interest of Destiny H. et al.*, 30 Neb. App. 885, 974 N.W.2d 343 (2022). Therefore, with such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort. *Id.*

The law does not require perfection of a parent. *Id*. Instead, we should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id*. Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child. *Id*.

Jesus argues that he meaningfully participated in the court-ordered programs, that he made progress towards reunification, and that the court erred in finding that a final severance of his parental rights was justified at this stage in the proceedings. Further, he denied that he continued to use methamphetamine and testified that he successfully passed 83 urinalysis tests and a hair follicle test to contradict the positive drug patch tests. Although we agree that Jesus participated in most of the court-ordered services designed to rehabilitate Jesus with a goal of reunification, we disagree that the record demonstrated meaningful progress as it relates to the goal of reunification.

Jesus' children were removed by the State, in large measure, due to Jesus and Anne's history of substance abuse and domestic violence. This marked the third time that Jesus and his children had been involved with DHHS. In addition to the ongoing danger this posed for the children, the children suffered significant trauma as a product of their parent's conduct. By the time of trial, the children had remained in out-of-home placement for nearly 2 years. During that time, Jesus had made no progress in relation to his substance abuse, as he continually tested positive for methamphetamine and attempted to deny his drug use claiming that the testing was flawed. We find that despite his testimony alleging he individually purchased and passed 83 urinalysis tests (there were no such test results in the record) and the single negative hair follicle test result he offered into evidence, the dozens of positive drug patch results spanning multiple months demonstrate clear and convincing evidence that Jesus remained a methamphetamine user and had made no progress toward resolving his addiction despite participating in court-ordered programs designed to help him.

Further, as it relates to his history of domestic violence with Anne, although we acknowledge there was no evidence of further incidents of violence following the children's removal, Jesus appeared to minimize his role in the domestic violence that led to his children's removal, he failed to take responsibility for his actions, and he maintained a relationship with Anne despite statements of his intentions to the contrary. Again, although Jesus participated in programs designed to rehabilitate him, minimization of his role in the children's removal and his failure to accept responsibility suggest a lack of progress towards the goals the programs were designed to achieve.

Because of Jesus' prior conduct, his children required significant therapy to treat the effects of trauma and their treatment was hampered by the barriers to family sessions with Jesus due to the therapist's concerns for the children's mental health. Although the therapist eventually pursued a handful of family sessions designed to unite Jesus with his children, those were suspended due to the children's detachment from Jesus when he interacted with them, which led to a trauma response and concern for the safety of their mental health and future counseling. Further, although Jesus participated in court-ordered supervised visitation, that visitation never progressed to unsupervised visitation due to Jesus' continued use of methamphetamine.

By the time of the trial, the children remained in out-of-home care for nearly 2 years and this removal marked the third occasion the family had been involved with DHHS for the same

concerns. After nearly 2 years, Jesus was no closer to reunifying with his children as he had made no progress in relation to his addiction, he minimized his role in the children's removal, he never progressed beyond supervised visitation, and the family therapy sessions were suspended out of concerns for the children's mental health. In contrast, both children were making meaningful progress with their foster parents as they had adjusted to a lifestyle without exposure to drug addiction and domestic violence.

Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Brooklyn T. & Charlotte T.*, 26 Neb. App. 669, 922 N.W.2d 240 (2018). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *Id.* It is not sufficient for a parent to simply participate in court-ordered services designed to rehabilitate them. The purpose of those services is to effect a change and address the concerns which led to the children's removal so that the parent is capable of safely reunifying with their children. Participation in certain elements of the court-ordered plan does not necessarily prevent the court from entering an order of termination where the parent has made no progress toward rehabilitation. *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003). A parent is required not only to follow the plan of the court to rehabilitate himself or herself but also to make reasonable efforts on his or her own to bring about rehabilitation. *Id.*

That did not happen here during the nearly 2 years following the children's removal. Because Jesus has failed to address the concerns that led to his children being removed, it is clear that Jesus will not be in a position to provide permanency to his children in the foreseeable future. Accordingly, we find that the court did not err in finding that Jesus was unfit and that termination of his parental rights was in Sophia and Selene's best interests.

## 2. CONSIDERATION OF GUARDIANSHIP

Jesus also assigns that the court erred in finding that termination of his parental rights was the last resort with no other reasonable alternative such as guardianship. He argues that, therefore, termination of his parental rights is not in the children's best interests.

In *In re Interest of Madison T. et al.*, 30 Neb. App. 470, 495-96, 970 N.W.2d 122, 139-40 (2022), this court addressed a similar argument wherein it stated:

> [Appellant] believed that a guardianship, rather than a termination of her parental rights, was in [the child's] best interests. We acknowledge that a guardianship in some instances might be a reasonable alternative to termination of parental rights. But there is no burden on the State to prove that termination is the only alternative available. *In re Interest of Q.R. and D.R.*, 231 Neb. 791, 438 N.W.2d 146 (1989). Also, the Nebraska Supreme Court has noted that a guardianship does not achieve the degree of permanency equivalent to parenthood or adoption. See *Calkins ex rel. Antonio S. v. Neb. HHS (In re Antonio S.)*, 270 Neb. 792, 708 N.W.2d 614 (2005). A guardianship under the Nebraska Juvenile Code is subject to the continuing jurisdiction of the juvenile court, which retains the power to terminate the guardianship. *Id.* See, also, *State v. Terry G. (In re Amber G.),* 250 Neb. 973, 554 N.W.2d 142 (1996), disapproved on other grounds, *State v. Kenny S. (In re Lilly S.),*

298 Neb. 306, 903 N.W.2d 651 (2017) (when guardianship is established, parent retains right to petition court for restoration of custody and full parental rights).

The State was not required to prove that termination of Jesus' parental rights was the only alternative available. On this record, we hold that the court did not err in finding that termination, as opposed to guardianship, was in the children's best interests. This assignment fails.

## VI. CONCLUSION

Because we find that statutory grounds for termination existed and that the evidence was sufficient to support the court's finding that termination was in the best interests of the children, we affirm.

AFFIRMED.